CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 0 5 2013

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

JUDITH SCOTT,          )     **CASE NO. 7:08CV000645**

         )

     **Plaintiff,**     )

         )     <u>**MEMORANDUM OPINION**</u>

**vs.**         )

         )

**MONTGOMERY COUNTY SCHOOL**  )

  **BOARD,**        )     **By: James C. Turk**

         )     **Senior United States District Judge**

     **Defendant.**     )

Plaintiff Judith Scott ("Scott" or "Plaintiff") filed this action against her former employer, Montgomery County School Board ("the Board"), asserting a number of employment-related claims. Her Complaint does not list separate counts, but contains a joint title listing her claims, to wit: "Claim for religious harassment, discrimination, retaliation and wrongful discharge." ECF No. 1 at 3. Based on the parties' summary judgment filings, the Court will treat the Complaint as asserting the following claims: (1) a claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), in which she asserts that her contract was not renewed as a result of religious discrimination; (2) a retaliation claim, in which she asserts that her contract was not renewed as a result of her complaints of religious harassment; and (3) a hostile work environment claim under Title VII based on her religion. See generally ECF No. 27.[1]

Pending before the Court is the Board's motion for summary judgment. ECF No. 24; see also ECF No. 25 (supporting memorandum). The Board contends that it is entitled to judgment

---

[1] In its supporting memorandum, Defendant questioned whether Plaintiff was also bringing a state law wrongful discharge claim, and to the extent she was, moved for summary judgment on that claim. In her response, Plaintiff did not respond to this argument or otherwise pursue a claim for wrongful discharge under Virginia law. Accordingly, the Court does not construe the Complaint as stating such a claim.

as a matter of law as to all of Scott's claims. Scott has filed a response to the motion for summary judgment, ECF No. 27, and the Board has filed a reply. ECF No. 29. The Court heard oral argument on July 15, 2013, and the matter is now ripe for disposition. For the reasons discussed herein, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.**

## I. FACTUAL BACKGROUND

### A. General

Plaintiff's claims all stem from her allegations that that she experienced undue religious pressure from her immediate supervisor, Nina Donohue. Scott was hired by the Board in 1992 and worked there until June 2006, at which time her annual contract was not renewed.[2] Scott Dep. at 13. Scott worked in several positions for the Board, but was working as an assistant media aid in the Blacksburg Middle School library when Donohoe was hired as the "media specialist" in 1995. Donohoe Dep. at 8. Donohoe was essentially the school's librarian, Donohoe Dep. at 8-9; Knott Dep. at 10, and Judy Scott was the library assistant. From 1995 until June 2006, the two worked together in the Blacksburg Middle School library. Scott's contract was renewed each year until June 2006, when the Board did not renew her annual contract for the 2006-2007 year based on the recommendation of the principal of Blacksburg Middle School, Danny Knott. Knott's decision, in turn, was based on input and recommendations from Assistant Principal Spencer Weiler and Donohoe, among others. See ECF No. 25-9, Knott Dep. at 10; ECF No. 25-8, Weiler Decl. at ¶¶ 21-23.

---

[2] In some cases, there may be a legally significant difference between the termination or firing of an employee, on the one hand, and the non-renewal of her contract, on the other. Here, however, Defendant does not dispute that the non-renewal of Scott's contract was an "adverse employment action." In this opinion, the Court will occasionally use the term "termination" to refer to the non-renewal of Scott's contract.

Donahue considers her faith to be "orthodox Christianity," centered around the person of Jesus Christ, and believes that Jesus Christ came to the earth, was crucified, died, was resurrected, and ascended to heaven. Donohoe Dep. at 13-15. Donahue described her church as an evangelical church, and herself as an evangelical. Id. at 16. According to her, that means that if she is "in a conversation with somebody, and [she] feel[s] that there is an open door for some sort of a conversation, that [she] might share either what [her] belief system is or ask them questions about theirs." Id. The door would be open "just about all the time when someone has shown [her] in some way that they also would be a Christian." Id.

Scott, by contrast, described herself in her deposition as "spiritual," but disavowed the term "Christian," explaining that she thought the word "Christian" has a lot of negative feelings attached to it, and that it has "too many bad connected feelings." Id. at 21-22. She testified that she was turned off to the word "Christian" when she began working with Donohoe in 1995 because Donohoe was "very forceful in her beliefs." Id. at 21-25. She also explained that she does not particularly like organized religion because she feels "like there has been a lot of hypocrisy." Id. at 28.

Scott testified that she attended various (mostly Protestant) churches growing up and in the early years of her marriage, including attending a spiritual retreat in the late 1980s. Id. at 20-23, 29. She and her husband had stopped being active in any church in approximately 1994, however, because they felt like they spent a lot of time away from their children and they wanted to have more time to spend with their children. Id. at 27. Nonetheless, her belief system includes a belief in God and a belief that "God and Christ and the Holy Spirit are one." Scott Dep. at 27. Additionally, she stated that she prays. Id. at 28.

Defendant argues that the alleged religious discrimination must be viewed in context and

against the appropriate backdrop, which is that Scott and Donohue were "of the same faith[,] knew each other and knew of each other's faith before they worked together[,] and . . . worked together for many years before issues arose." See ECF No. 25 at 2. Specifically, Scott testified that she first met Donohue in 1981 because Donohue lived on the same street where Plaintiff and her husband were operating a shelter home for kids. Scott Dep. at 13, 16. Churches and other religious groups assisted the shelter. Id. at 18. At the time, Plaintiff's husband was an assistant pastor at Wesleyan Methodist Church in Blacksburg, Virginia. Id. at 15. He had also served as a pastor at a Wesleyan Methodist Church in Hampton, Virginia in the mid-1980s. Id. at 20. As a result of these connections, Donohoe and the Board contend that Donohoe reasonably believed Scott was open to religious overtures. See Donohoe Dep. at 36. Thus, according to the Board, the overtures were neither harassing nor discriminatory.

**B. Specific Allegations of Harassment**

Before turning to a more chronological description of events at issue, the Court provides an overview of Scott's allegations of religious harassment. In her sworn Answers to Interrogatories, Scott listed a number of incidents that she alleges constituted harassment by Donohoe based on religion. First, she contends that in August 1995 when Donohoe was hired, Donohoe and Scott saw each other in a store and Donohoe told Scott she wanted to start their day with a daily devotion and prayer. Scott Dep. at 45-46. Scott expressed her discomfort, and said she just didn't think that was appropriate at school. Id. At some point in 1998, Donohoe asked if she could pray and said to Scott "I know you are not comfortable with it." Id. at 46. Scott responded, "Yes, you are right, I'm not." [and] Donohoe "left it." Id. Scott posits that these incidents show that Donohue knew Scott was not interested in religious activities.

Despite this purported knowledge by Donohoe, Scott avers that Donohoe continued to

attempt to coerce her to engage in prayer and Bible studies in school, and left religious materials for Scott to review. See ECF No. 27, Ex. 13, Answers to Interrogatories at 3. In April 2005, Donohoe asked if she could pray for Scott, and solicited prayer from Scott. Id. Donohoe and others also asked Scott to attend a Christian conference in the spring of 2005. Id.; see also Donohoe Dep. at 41-43. Scott declined to attend, but Donohoe and other teachers brought religious items (including an audiotape, book, and compact disc) from the conference and gave them to Scott. ECF No. 27-13, Answers to Interrogatories at 3; see also Donohoe Dep. at 41-43.[3]

Also, throughout the period of time Donohoe was her supervisor, Scott would find notes, prayer lists and religious materials left in areas where she worked. Id. In March 2006, Donohoe left a sticky note for Scott that had the word "praise" written on it, which Scott interpreted as meaning "Praise God." Id. Donohoe also told Scott during an evaluation meeting that she felt a "righteous anger" toward her, which Scott interpreted as referring to a Biblical or religious concept of anger.[4]

---

[3] Scott also contends that the harassment included an incident in which Donohoe attempted to visit Scott and Scott's son in the hospital upon learning that the son had been taken to the emergency room. Scott testified that she felt this was an invasion of her family's privacy and believes that the only reason Donohoe came was that it was her "Christian duty." There is no evidence that the visit was religiously-motivated, however, other than Scott's belief that everything Donohoe does is religiously motivated. Thus, the Court does not consider this an instance of religious harassment.

[4] In ruling on the Board's summary judgment motion, the Court must construe all evidence in the light most favorable to Scott. It is worth noting, though, that Donohoe disputed the accuracy of many of Scott's allegations. For example, Donohoe denied that she left scriptures or prayer lists in Scott's work area and instead testified that they were in her own personal work space, although she admitted that there were times when others "might have sat there" if she was not in the library. Donohoe described the circulation desk in the library as containing three areas, one in the middle that was Donohoe's personal workspace, one on the right that was a computer that Scott often worked on (although Scott also had her own office behind the circulation desk), and a third area that housed another computer near the book-drop, which was where books were commonly checked in. Donohoe Dep. at 50-52. Donohoe testified that the notes and scripture verses were left only in her personal workspace. Similarly, she denied that either the "praise" note or the comment about her "righteous anger" were rooted in religion. Instead, she asserted that the "praise" note was a reminder to herself to praise Scott more. The righteous anger was meant by her in the sense that she was "angry for a reason that something has been done to you that maybe—maybe your rights have been intruded on." Donohoe Dep. at 104.

## C. Work Relationship Between Donohoe and Scott Through Spring 2005

From the time Donohoe was hired until approximately the spring of 2005, the two women worked relatively well together. Although there was some limited testimony regarding tension or difficulty in those years,[5] it appears that the bulk of the difficulties between Scott and Donohue (and certainly the bulk of the allegations supporting Scott's claims) began in the spring of 2005, near the end of the 2004-2005 school year.

Prior to that time, Scott testified that she and Donohoe were "friendly" and had worked as "a team," but that she did not "have a deep relationship with" Donohoe. Scott Dep. at 189. Like Donohoe, Scott testified that the problems between the two of them began in earnest (or worsened significantly) in May 2005. ECF No. 27-14 at 3 (attachment to EEOC charge, stating that they stopped working as a "team" in May 2005). Scott describes two incidents that she says really angered Donohoe in May 2005. In the first, which occurred on May 4, 2005, Scott testified that Donohoe had "accosted" a young boy about tearing up a book and asked for Scott to join her in her admonishment. Scott Dep. at 184, see also ECF No. 27-14 at 3. Scott disagreed with Donohoe's treatment of the child and instead quoted back to Donohoe something from the religious conference materials Donohoe had given her, something to the effect of how Scott would not let the incident "steal [her] joy." ECF No. 27-14 at 3-4. Consequently, Donohoe became enraged with Scott and began ignoring her. Id. In the second, Scott thought that Donohoe

---

[5] For example, Donohoe testified that she and Scott filed informal complaints against each other in approximately 2001 related to insubordination and Scott's refusal to respect Donohoe's ability to direct her work. Donohoe Dep. at 84. Additionally, Scott testified that she had filed an informal complaint against Donohoe "in the early years," but did not remember what she wrote down or what she complained about specifically." Scott Dep. at 80. She testified that the complaint was "rooted in religion because [Donohoe is] staunch, angry, unkind." Id. Scott also testified that there were incidents of religious harassment between 1995 and 2005, but that she couldn't recall them and that she had thrown out everything when they moved to a new school around 2002 or 2003. Scott Dep. at 57.

6

had overheard her in a conversation with a friend in which Scott told the friend that she would never let Donohoe "lay hands" on her, as Donohoe had apparently done for another teacher at the school. Id. at 4. According to Scott, Donohoe became "short tempered and abrupt" with her after that. Id.

Also in the April and May 2005 time-frame, Donohoe repeatedly invited Scott to attend a religious conference with her and to join a Bible study group at the school. Scott Dep. at 38, 48, 70; Donohoe Dep. at 27, 45-46, 48 (Donohoe acknowledging that she and others, on more than one occasion, had invited Scott to attend the Bible study that was held by a group of teachers at the school, and that she and others had asked Scott to attend a religious conference in the spring of 2005). Scott declined both invitations, but testified that Donohoe seemed to get angrier and to critique Scott's performance more harshly after Scott refused to participate in those events. ECF No. 27-14 at 3.

The Board paints a different picture as to the root cause of the problems between the two women. According to Donohoe, Scott's work performance began to decline in January 2005 as a result of problems Scott was having in her personal life. Donohoe Dep. at 65-66. Scott had been arriving late at work, coming to work crying, and sitting in front of her computer for up to thirty minutes at a time crying. Id. at 65. Donohoe testified that she noted the beginning of a breakdown in her friendship with Scott when, in May 2005, Scott abruptly left the library after complaining that she "couldn't take this anymore." Id. at 62-64. Shortly thereafter, Scott returned to the library to tell Donohoe that she had talked with an assistant administrator and was leaving work for the day. Id. at 64-65.

At the end of that day, Donohoe reported the behavior to Weiler, the Assistant Principal. Id. at 70. According to Donohoe, she informed Assistant Principal Weiler about a number of

problems or issues that she believed Scott was having with her work performance. Donohoe Dep. at 70-73, 83. In response, Weiler instructed Donohoe to prepare a list of her concerns and to take Scott aside to address them. Id. at 73. Apparently, this was done. Donohoe Dep. at 74-75; see also ECF No. 27-12 at P153 (Plaintiff explaining that in her June 2005 evaluation with Donohoe she said she would "try to do better"). At the end of the school year, Weiler asked for an assessment, which Donohoe provided. Donohoe Dep. 76; ECF No. 25-7 at 10.

Weiler then wrote a letter to Scott in June 2005, summarizing the concerns raised by Donohoe. The letter was mailed to Scott, but was returned because the school did not have an updated address for her. ECF No. 25-8, Weiler Decl. at ¶ 8(a)[6] & Ex. A thereto. Accordingly, Scott received it when she returned in August to begin the 2005-2006 school year. In response to the letter, Plaintiff testified that she met with Weiler and told him then that she believed the issues raised by Donohoe and documented in the letter were religiously motivated. Scott Dep. at 77-78.

### D. The 2005-2006 School Year and Scott's Complaints of Discrimination

Early on in the 2005-2006 school year, there was an incident in which Scott received a verbal reprimand from Weiler for allegedly accessing Donohoe's personal computer files without Donohoe's permission. ECF No. 25-8, Weiler Decl. at ¶ 8(b). According to Scott, Donohoe had left a document which evaluated Scott's performance on a computer that many people used, knew the password to, and could access. Scott has given multiple reasons as to why she accessed the document. She told the Board, in the official discrimination complaint she later filed, that she thought she had already seen the information in the document but had forgotten some things that she wanted to recall, so she opened it. ECF No. 25-4 at 12. But she also has

---

[6] Mr. Weiler's Declaration contains two paragraphs both numbered with an 8. The Court refers to the first as 8(a), and the second as 8(b).

8

stated that she believed it was not proper for the document—which contained private and personal information about her—to be left on a computer where others could use a generic logon and see it, and she was upset by this. Id.; ECF No. 27-14 at 4.

Additionally, Weiler and Donohoe determined early on in the year that Scott would receive more frequent evaluations, instead of just one annual evaluation at the conclusion of the year—what the parties have referred to as "formative evaluations." According to Weiler, the purposes of these evaluations "were to attempt to correct issues with Ms. Scott's work performance and to gather sufficient information to prepare Ms. Scott's annual evaluation." ECF No. 25-8, Weiler Decl. at ¶¶ 9-10. The documentation reflects that Scott was the one who requested that the administration be involved in these sessions, and Donohoe agreed with the suggestion.

During these evaluations, Weiler obtained written input from both Donohoe and Scott and held several meetings with them during the year to discuss strengths and weaknesses in Scott's job performance. Weiler avers that it was "[a]fter the creation of this formative evaluation process," that Scott told him that the issues in the Media Center were the result of Donohoe's vindictiveness and because Scott had stopped going to church. Id. at ¶ 11. She also complained to him that she believed Donohoe was being colder and less inviting since she would not attend a Bible group, and she complained that Donohoe and others were conducting a Bible study on school property after hours. Id. at ¶ 12.[7]

Weiler avers he sensed that "the religious contact was welcomed by Ms. Scott until Ms. Scott chose to remove herself from that circle of individuals [and] when she chose to do that, Ms. Scott felt chilling effect on her personal relationship with Ms. Donohoe." Id. at ¶ 15. Weiler

---

[7] Scott also acknowledged at that time that she had been having problems with her children that had caused her, during the 2004-2005 year, to be late to work or need to leave early.

states that he investigated Scott's claim of harassment (primarily, it appears, by speaking with Donohoe and other school administrators) and spoke with Donohoe about it, advising both of them that "vindictiveness and religious harassment would not be tolerated." Id. at ¶ 16. Weiler contends that he did not observe any evidence of vindictiveness or religious harassment by Donohoe, any religious hostility directed toward Scott in the Media Center or anywhere in the school by Donohoe or any other person, or any objective evidence of religious harassment against Scott. Id. at ¶¶ 18-20.

On February 8, 2006, Scott also sent an email to Dr. Anderson, the Superintendent of Schools, in which Scott primarily complained about a label task Donohoe had asked her to perform, because Scott felt it was physically hazardous. Scott Dep. 167. In one sentence of that letter, however, Scott stated that Donohoe's "strong religious views have been a source of contention and that just makes me look even more like a sinner." Id.; Scott Dep. at 169. Dr. Anderson's only response was to advise Plaintiff that the principal of the school handles personnel issues. Id.

On March 23, 2006, Scott filed a "Report of Discrimination/Harassment" with the Board, stating that she believed Donohoe was discriminating against her. ECF No. 25-4 at 10-12. The document did not mention religion, however, except to say that Donohue had said she had a "righteous anger" against Scott during an evaluation meeting. Id. Scott later met with two persons from the administrative office to discuss her complaint. They both interviewed her but informed her that her complaint was unsubstantiated. Scott Dep. at 101-102.

As for the formative evaluation process, the record contains one written "formative" evaluation, as well as a final evaluation. ECF No. 25-5 at 6-7, 26-27 ("Formative evaluation" dated December 19, 2005 and final 2005-2006 evaluation). There were also numerous

documents prepared by both Donohue and Scott regarding Scott's job performance, emails and notes between each and Weiler, and several meetings held during the year where the three of them discussed Scott's performance. Donohue repeatedly noted problems with Scott being "insubordinate" toward her or failing to work cooperatively with her. In her final evaluation input, prepared in April 2006, Donohoe acknowledged that some of the concerns that she had raised earlier in the year had been addressed and corrected. For example, she said "for the most part, [Scott's] work on the Library database and with books had been prompt, accurate, neat and thorough," that her attendance rate and punctuality had improved, and that she was making better use of her time. Donohoe also identified areas needing improvement, such as Scott needing to be more "thorough" in her work, which was described as "Judy needs to read daily lesson plans thoroughly, and follow task instructions exactly. She needs to ask questions when in doubt." Id. The remaining areas needing improvement all related to weaknesses in Scott's relationship with Donohoe. Id. For example, Donohoe said that Scott was "frequently unpleasant, not courteous, and not tactful in her relationship with Nina," and was "often terse, unfriendly and uncommunicative." According to Donohoe, Scott needed to "work cooperatively with Nina, not just others," to be more receptive to suggestions and to react more positively to criticism. Id.

At the end of the 2005-2006 year, Weiler's evaluation recommended that Scott's contract not be renewed. ECF No. 25-5 at 26-27. Notably, though, the final evaluation indicates that Scott was fulfilling job requirements in the majority of 27 areas of evaluation, but that she "need[ed] improvement" in 8 areas. Id. In the comments section, Weiler wrote, "Ms. Scott has had difficulty with her relationship with the media center supervisor, Ms. Donohoe. As a result of this conflict, Ms. Scott received lower ratings in areas that address her interactions with Ms. Donohoe." Id. at 27.

Apparently, then-Principal Danny Knott (who was new to the school that year) made the recommendation to the Board to not renew Scott's contract, and the Board adopted his recommendation without any independent assessment of the issue. See Weiler Decl. at ¶¶ 22-23; Knott Dep. at 10. Scott was informed of this decision several weeks before the end of school and she completed the school year. According to Scott, when she saw Weiler after the year had ended at a social event, he gave her a hug and told her that he knew she "did a good job." Scott Dep. at 186-87. Weiler and Knott also both wrote Scott favorable letters of recommendation.

Scott filed a timely charge of discrimination with the EEOC, received a right-to-sue notice, and timely filed her Complaint.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when a rational trier of fact, considering the evidence in the record as a whole, could find in favor of the non-moving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)). Put differently, summary judgment should be entered if the Court finds, after a review of the record as a whole, that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

## B. Religious Discrimination Claim Based On the Non-Renewal of Scott's Contract

The parties appear to agree that the general framework governing most Title VII claims, which was first described in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 807 (1973), is applicable here. Under this burden-shifting framework, a plaintiff alleging discrimination has the initial burden to establish a prima facie case. If a plaintiff establishes his prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. "If the employer does so, the plaintiff must then show that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." <u>Bonds v. Leavitt</u>, 629 F.3d 369, 386 (4th Cir. 2011) (internal quotation marks omitted) (quoting <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). "At this last step, the burden to demonstrate pretext merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." <u>Lettieri v. Equant Inc.</u>, 478 F.3d 640, 646-47 (4th Cir. 2007) (citations and internal quotation marks omitted).

### 1. Prima Facie Case

Defendant urges the Court to utilize a four-part prima facie test, based on the original <u>McDonnell Douglas</u> framework, which requires a plaintiff to show: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing her job satisfactorily at the time of the adverse action; and (4) that her position remained open or was filled by a similarly qualified applicant outside the protected class. ECF No. 25 at 34. Utilizing this test, Defendant does not dispute that the non-renewal of Scott's contract was an adverse employment action, but it argues that she has failed to establish the other three elements of the test. ECF No. 25 at 34.

In analyzing Plaintiff's claim, however, the Court agrees with the Tenth Circuit Court of

Appeals that the foregoing test does not "neatly fit" a claim such as the one here, where a plaintiff alleges that she was discriminated against because she did not share her supervisor's religious beliefs. Shapolia v. Los Alamos Nat'l Lab., 992 F.2d 1033, 1037-1038 (10th Cir. 1993). Instead, the Shapolia Court adopted a modified *prima* facie case in such cases, requiring a plaintiff to show (1) that she was subjected to some adverse employment action; (2) that, at the time the employment action was taken, her job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow her employer's religious beliefs. 992 F.2d at 1038.

The Seventh Circuit and lower courts within the Fourth Circuit have also adopted this test in dealing with a plaintiff's claims that an employer discriminated against him because he did not share the employer's or supervisor's religious beliefs. See, e.g., Sattar v. Motorola, Inc., 138 F.3d 1164, 1169-70 (7th Cir. 1998); Henegar v. Sears, Roebuck & Co., 965 F. Supp. 833, 836-37 (N.D.W.Va. 1997) (collecting authority addressing whether a Title VII discrimination action lies when a plaintiff alleges that an adverse employment decision resulted from her failure to share the employer's religious views and concluding that it does); Yancey v. Nat'l Ctr. on Institutions & Alternatives, 986 F. Supp. 945, 954 (D. Md. 1997), aff'd, 1998 WL 196733 (4th Cir. 1998) (following the Henegar court's lead and adopting the same test from Shapolia). See also Lawrence v. Mars, Inc., 955 F.2d 902, 905-06 (4th Cir. 1992) (where plaintiff claimed he was discharged because of his religion, the prima facie case required him to "(1) prove that his job performance was satisfactory, and (2) present direct or indirect evidence whose cumulative probative force supports a reasonable inference that his discharge was discriminatory") (citations omitted).

The Court concludes that this is an appropriate prima facie case to use in the case at bar. Under this test, there is no requirement that Plaintiff be a member of a protected class, since "it is the religious beliefs of the employer, and the fact that [Plaintiff] does not share them, that constitute the basis of the claim." Shapolia, 992 F.2d at 1038. Put differently, "[w]here discrimination is not targeted against a particular religion, but against those who do not share a particular religious belief, the use of the protected class factor is inappropriate." Id.; see also Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997) (in context of similar discriminatory termination claim, "[w]hat matters . . . is not so much what [the plaintiff's] own religious beliefs were, but [her supervisor's] asserted perception that she did not share his own"; in such a case the plaintiff "need not put a label on her own religious beliefs, [she] need only show that her perceived religious shortcomings (her unwillingness to strive for salvation as [her supervisor] understood it, for example)" prompted her discharge). Similarly, there is no requirement that Plaintiff show she was replaced with someone outside the protected class.

Turning then to the evidence as to each of the elements of the Shapolia prima facie case, it is undisputed that an adverse action was taken against Scott in the form on the non-renewal of her annual contract. Significantly, her contract previously had been renewed each year for more than ten years. As noted, the Board does not challenge that this element has been met. See generally ECF No. 25.

As to the second element, the Court concludes that there is a dispute of fact as to whether Scott's job performance was satisfactory at the time her contract was not renewed. Certainly, the Board has put forth ample evidence that Plaintiff was having performance problems. But there is also some evidence, and sufficient evidence from which a reasonable jury could find, that Plaintiff's performance was satisfactory. First and foremost, both of the individuals who made

the decision not to renew Plaintiff's contract wrote her favorable letters of recommendation immediately after she was terminated. See ECF No. 27-20, ECF No. 27-21. These letters praise Plaintiff and her work performance and are also consistent with Plaintiff's testimony that Weiler told her shortly after she was terminated, "I know you did a good job." Scott Dep. at 186-87.

Defendant has implored the Court to look at what the recommendation letters do not say. See ECF No. 29 at 5-6, 8. For example, Defendant points out that one of the letters does not state that it actually "recommends" Scott for any job and that neither letter expressly states that Scott was performing satisfactorily for the Board or in her present job. Id. But in viewing both letters from the perspective of a future potential employer who received them, the message conveyed is much simpler: "Scott was a great employee." For example, Knott's letter includes the statement, "She has a professional demeanor and works to assist all staff and students to the best of her ability." ECF No. 27-20.[8] Weiler's letter gives Scott "a strong recommendation for employment." ECF No. 27-21. It states, in part, that "[s]he makes friends easily and offers support to the faculty and students" at the school and that "[b]ecause of her interpersonal skills and sincere concern for others, she will be sorely missed at the school." Id. It includes the statement that "[s]he will prove to be a valuable asset to any organization" and that he "guarantee[s] she will bring this ability to connect with others to a different organization with the same positive impact." Id. Moreover, neither letter gives a future employer a reason to think that Scott was not performing satisfactorily. To the contrary, both letters are extremely complimentary. They provide, therefore, at least some evidence that she was performing satisfactorily. Additionally, Plaintiff testified that Weiler told her, after her termination, that he knew she had done a good job. Scott Dep. at 186-87.

---

[8] Defendant urges that "to the best of her ability" qualifies and diminishes the statement. ECF No. 29 at 5. But the sentence also includes the words "all staff," which would include Donohoe.

Second, Plaintiff's evaluations had been good and even her final evaluation was mostly positive. Indeed, Scott's final performance evaluation shows that she received the highest possible mark in nearly all areas that were not impacted by her relationship with Donohoe. Accordingly, there is sufficient evidence to establish the second prong of a prima facie case.

Whether or not Plaintiff has put forth sufficient evidence of the final element of her prima facie case is a closer call. In looking at all the evidence before the Court, there is certainly substantial evidence that suggests that Scott's work performance was the reason her contract was not renewed. But there are also facts supporting Scott's claim that the reason for her termination was religious discrimination.

In particular, Donohoe's input was crucial in the decision to not renew Scott's contract, and Donohoe is the individual who purportedly possessed the religious animus and engaged in the harassment. While Donohoe might not have been Scott's supervisor for purposes of determining vicarious liability in a harassment suit, see Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013), and was not the person that formally made the decision not to renew Scott's contract, Donohoe certainly played a crucial role in the decision to terminate Scott. As the Fourth Circuit has explained, "Title VII . . . [does] not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer," but can also include a subordinate employee if the subordinate was "principally responsible" for the plaintiff's firing. Hill, 354 F.3d at 288, 290 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)). "To survive summary judgment, an aggrieved employee who rests [her] discrimination claim upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision . . . ." Id. at 291.

In this case, Plaintiff has satisfied that burden for purposes of summary judgment. It was Donohoe who first brought to the attention of the administrators that she had concerns about Scott's performance. It was Donohoe who monitored, primarily evaluated, and oversaw Scott's performance in her final year. Likewise, it was Donohoe's input that was considered by and led to the decisions by both Weiler and Knott, the formal decision-makers here. Moreover, all the areas of weakness noted by Weiler were areas of difficulty that Scott had in her relationship with Donohoe.

As to whether or not Donohoe possessed any religious animus toward Scott, the Court acknowledges that Donohoe denies ever harassing or discriminating against Scott on the basis of religion. As Donohoe explains it, her history with Scott gave her no reason to think that religious overtures were in any way unwelcome. That history included praying together, sharing their faith together, and conduct by Scott herself, such as giving Donohoe a card in which she wrote that Donohoe was her "Christian sister" and writing, in a 2004 Christmas card, that her "prayer" for Donohoe was peace and joy for Donohoe and her family. Based on all of this, Donohoe stated that she "had no reason to believe that Ms. Scott did not welcome my expressions of religion when she so warmly expressed them to me." ECF No. 25-7, Donohoe Decl. at ¶ 7.

The Court finds, however, that there is at least a dispute of fact on this issue, since Scott has presented undisputed evidence that she did not join the Bible study group when asked, and did not attend the religious retreat when asked. She also told Donohoe (back in 1995) that she was not comfortable beginning each day with a prayer or devotional before work and Donohoe expressed to Scott in 1998 that Donohoe knew Scott wasn't comfortable praying at work. Based on these facts, the Court concludes that a reasonable jury could find that: (1) Donohoe knew the overtures were not welcome and nonetheless persisted in making them; (2) that the continued

18

rejection of these overtures led Donohoe to evaluate and criticize Plaintiff's work more harshly; and (3) that, were it not for Donohoe's criticisms and harsh evaluations, Plaintiff's contract would have been renewed. In the Court's view, the evidence supporting a causal link between the rejected religious overtures by Donohoe and the non-renewal of Scott's contract is weak, but sufficient to withstand summary judgment. See, e.g., Evans, 80 F.3d at 960 (instructing that when "the evidence creates a close call . . ., we must remember that "the burden of establishing a prima facie case of disparate treatment is not onerous") (citation omitted).

## 2. Pretext

Having concluded that Scott has established a prima facie case, the Court easily finds that the Board has met its burden of production and put forth a legitimate, non-discriminatory reason for her termination. Thus, the Court's final inquiry is whether there is sufficient evidence that the reason given is a pretext for a discrimination. Again, the favorable letters of recommendation support Plaintiff's argument of pretext. See, e.g., Johnson v. Wal-Mart Stores, East, L.P., 2013 WL 1163511, *7 (W.D.N.C. 2013) (denying defendant's summary judgment motion where evidence of pretext included fact that supervisor terminating plaintiff offered him a letter of recommendation, although noting that the offer "may have been nothing more than [the supervisor's] emotional response to terminating a friend"). Moreover, the same evidence that supported the final element of Plaintiff's prima facie case, especially when coupled with the evidence of pretext, is also minimally sufficient evidence to show that the real reason for Plaintiff's non-renewal of her contract was religious discrimination. See, e.g., Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) ("a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may

permit the trier of fact to conclude that the employer unlawfully discriminated").[9]

At the summary judgment stage, the Court's task is to determine whether there is sufficient evidence from which a reasonable jury could find for Scott, if the disputed facts were resolved in her favor. For all of the foregoing reasons, the Court concludes that a reasonable jury could so find, and thus it **DENIES** the Board's summary judgment motion as to the religious discrimination claim in the non-renewal of Scott's contract.

### C. Retaliation Claim

The framework for analyzing Scott's retaliation claim is similar to the elements of a prima facie case of discharge discussed in the preceding section. Specifically, to prove a *prima facie* case for retaliation, an employee must show that: (1) she engaged in a protected activity; (2) the employer took adverse employment action against the employee; and (3) a sufficient causal connection exists between the protected activity and the adverse employment action. Lettieri v. Equant, Inc., 478 F.3d 640, 649-50 & n. 2 (4th Cir. 2007); Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536, 543 (4th Cir. 2003). As with her earlier claim, "[i]f the plaintiff establishes [a] prima facie case, the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" Lettieri, 478 F.3d at 646 (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)); see also id. at 651 (applying the pretext analysis to retaliation claim). Then, "the burden returns to the plaintiff to show that 'the employer's proffered permissible reason for

---

[9] The Board focuses heavily on Plaintiff's supposed "admission" that Knott terminated her because, as a former coach, he viewed her as the "weak player." See ECF No. 29 at 8 (discussing Scott Dep. at 187-88). But this "admission" cannot bear the weight the Board assigns to it. Scott may have believed she was the weaker player as between her and Donohoe and that if one of them had to be fired or transferred, it was going to be her. If the only reason one of them had to go, however, was because of religious discrimination, then the fact that Scott admits she was easier to replace does not doom her claim. Put differently, if the problems in the working relationship were manufactured or concocted by Donohoe because Scott refused her religious overtures, then Scott's statement does not equate with an admission that religion was not the cause of her termination.

20

taking an adverse employment action is actually a pretext for discrimination.'" Id. at 646 (quoting Hill, 354 F.3d at 285).

In a recent decision, the Supreme Court has emphasized that a Title VII retaliation claim requires that the complaint be the but-for cause of the retaliatory action. Univ. of Tx. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). That is, a Title VII retaliation plaintiff must establish that "her protected activity was a but-for cause of the alleged adverse action by the employer," and not merely a "motivating factor." See id. Again, "[t]he ultimate question is whether the employer intentionally [retaliated], and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'" Reeves, 530 U.S. at 146-47 (quoting St. Mary's, 509 U.S. at 524). "It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation" of retaliation. St. Mary's, 509 U.S. at 519.

As discussed, Scott alleges that after she complained about the alleged discriminatory actions of Donohoe (first to Weiler in August or September of 2005), and again during the formative evaluation process, as well as through her formal complaint to the Board in March 2006, she was terminated. The Board contends that there is no causal evidence linking her complaints of religious discrimination to her termination. ECF No. 25 at ECF No. 29 at 6-9. In particular, it points out that Scott's performance problems had already been noted and called to her attention when she first complained about religious discrimination by Donohoe. It also points to the same performance problems it relies on as its non-discriminatory reason for her termination.

Again, as with Plaintiff's claim of disparate treatment, the Court believes it a close case whether the retaliation claim should be permitted to continue to trial. In particular, the Court

finds it curious that Scott's first complaint of harassment based on religion did not occur until _after_ she had received the letter in August 2005 setting forth problems with her performance the prior school year. See ECF No. 27-13 at 4. Nonetheless, for the same reasons described when discussing her discrimination in termination claim, the Court concludes there are disputes of fact as to whether Scott was terminated because of her own job performance, or whether it was Scott's complaints about religious harassment that caused her termination.

Accordingly, the Court **DENIES** summary judgment on Plaintiff's retaliation claim.

### D. Hostile Work Environment/Harassment Claim

In her third and final claim, Scott alleges that she experienced discrimination in the form of a hostile work environment based on religion. To succeed on her religious harassment claim, Scott must demonstrate that a reasonable jury could find the harassment: (1) unwelcome; (2) because of her religion; (3) "sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to create an abusive work environment;" and (4) that there is some basis for imputing liability to plaintiff's employer. Mosby–Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010) (quoting EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009)). An affirmative defense is available to employers that "can demonstrate, by a preponderance of the evidence, that (1) [they] 'exercised reasonable care to prevent and correct promptly any harassing behavior'; and (2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Id. at 186 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)).

The Board contends that Scott cannot establish any of the elements of her hostile work environment claim. It claims first that Scott never informed or engaged in action to inform

Donohoe that her religious overtures or invitations were unwelcome.[10] Second, the Board contends that Plaintiff cannot satisfy the second prong of her claim and show that she is a member of the protected class, because the challenged conduct must be "motivated by religious animosity" and is it is not "sufficient that the alleged harassment only relate to religion." ECF No. 25 at 25-26 (citing EEOC v. Sunbelt Rentals, 521 F. 3d 306, 314 (4th Cir. 2008); Gilliam v. S. Ct. Dep't of Juvenile Justice, 474 F.3d 134, 142-43 (4th Cir. 2007)).[11]

The Court rests its decision, however, on a narrower ground. Specifically, the Court concludes that Scott has failed to put forth sufficient evidence to establish the third element of her hostile work environment claim, which requires her to show that the offending conduct was

---

[10] In connection with this argument, the Board points out the various occasions on which Scott made references to religion in a positive way. These include her hand-written notes to Donohoe calling Donohoe her "Christian sister" and thanking Donohoe for her "material and spiritual" gifts. They also include the fact that when Donohoe and other teachers brought Scott back a copy of the religious materials from the conference, she wrote thank you notes and said thank you in person. She did not tell them that she did not want them or that the materials were unwelcome.

[11] The Court's ruling as to the third element of Scott's claim obviates the need for an extended discussion of this argument. But the Court notes that Title VII's definition of "religion" includes "all aspects of religious observance and practice, as well as belief . . . ." 42 U.S.C. § 2000e(j), and that the statute protects persons who are not members of organized religious groups as well as atheists. Young v. Southwestern Savings and Loan Assoc., 509 F.2d 140, 142 & n.3 (5th Cir. 1975); EEOC v. Townley Eng'g & Mfg. Co., 859 F.2d 610, 613-14 n.5 (9th Cir. 1988). Moreover, as the district court in Shapolia recognized, Title VII forbids requiring "religious conformity" in order to receive the fair and equal treatment by an employer. Shapolia v. Los Alamos Nat. Laboratory, 773 F. Supp. 304, 305 (D.N.M. 1992) (citing Young) (where Plaintiff alleged that he was discriminated against because he, as a "non-Mormon," does not share his supervisors' religious beliefs, he stated a claim of religious discrimination). Thus, Plaintiff's allegation that she was discriminated against by Donohoe for being a spiritual person (as she describes herself) or for being a non-evangelical Christian, may be sufficient to support the second element of her claim. In other words, there need not be animus against Scott's precise religion. Cf. Massie v. Ikon Office Solutions, Inc., 381 F. Supp. 2d 91, 100 (N.D.N.Y. 2005) (in case where plaintiff claimed his evangelical Christian supervisor tried to proselytize him, there was at least an issue of fact as whether the plaintiff was in a protected class; the plaintiff was not an atheist, but had "walked the paths of many religions"); Weinstein v. U.S. Air Force, 468 F. Supp. 2d 1366, (2006) (in an establishment clause case, addressing a claim alleging that evangelical Christianity was a different category of religion than "non-evangelical Christian"). See also Barry Hankins, American Evangelicals: A Contemporary History of Mainstream Religious Movement 186 (2008) ("[Evangelicals] are distinct and they are divided, they are diverse and share common beliefs, and they are contentious, among themselves and with nonevangelicals."), cited in Lisa Shaw Roy, The Evangelical Footprint, 2011 Mich. St. L. Rev. 1235, 1247 n.76 (2011).

"sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to create an abusive work environment." Mosby–Grant, 630 F.3d at 334.

Even if accepted as true in their entirety, the allegations here simply do not rise to the level required to establish a hostile work environment, which the Supreme Court has described as a work place that is "permeated with discriminatory intimidation, ridicule and insult." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). While Scott and Donohoe clearly had difficulty working together, at least in their final two years, Title VII is not a "general civility code" because if that were the case "we would be litigating past sundown in ever so many circumstances." Ziskie v. Mineta, 547 F.3d 220, 228 (4th Cir. 2008).

While there is evidence that Donohoe's conduct was subjectively upsetting to Scott, to be actionable, the conduct must also have been objectively unreasonable. This is so because not every workplace aggravation gives rise to an actionable legal claim. See Sunbelt Rentals, Inc., 521 F.3d at 316 ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life."). Thus, the objective prong of the test is "designed to disfavor claims based on an individual's hyper-sensitivity." EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 328 (4th Cir. 2010).

The Fourth Circuit has stated that to determine whether a reasonable person would find a work environment hostile, courts look "at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Singleton v. Dep't of Corr. Educ., 115 Fed. App'x 119, 122 (4th Cir. 2004) (unpublished) (quoting Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998)).

Here, most of the conduct complained about was not even tied to religion, but was simply disagreement over the way Donohoe allegedly managed (or mismanaged) and interacted with Scott. While Donohoe's religious beliefs were apparent, Scott does not testify that Donohoe ever made any overt statements to indicate that she believed Scott was not sufficiently religious or holy. Indeed, with regard to the scripture verses or prayer requests that were written down, the evidence generally supports that, at most, Donohoe left notes in a place where Scott (and others) could see them. But there is little, if any, evidence to show that the notes were directed at Scott or intended to upset her, convert her, or to suggest that she was not sufficiently Christian, other than the fact that Scott interpreted them that way. Similarly, an invitation to join a Bible study group and to attend a religious conference, especially to a person who has written the inviter a card calling her a "Christian sister," are simply not the type of physically threatening or humiliating conduct for which Title VII was meant to provide a remedy.

In short, most of these incidents were innocuous, especially in light of the context in which they occurred. They were not severe, nor were they physically threatening or humiliating. The Court thus concludes, based on all the relevant factors, that there is not enough evidence from which a jury could find the conduct at issue to be sufficiently severe and pervasive to be actionable. See also Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008) ("complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII") (internal citations and quotation marks omitted).

Accordingly, the Court **GRANTS** Defendant's summary judgment motion as to Plaintiff's hostile work environment claim.

### E. Punitive Damages

The Board also seeks dismissal of Plaintiff's request for punitive damages, contending that it cannot be held liable for punitive damages because it is a governmental entity. ECF No. 25 at 35 (citing 42 U.S.C. § 1981a(b)(1); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 268 (1981)). Plaintiff failed to respond to this argument, either in her briefing or at argument, and the Court concludes it is well taken. Accordingly, the Court **GRANTS** the Board's motion for summary judgment on this issue and hereby **STRIKES** Plaintiff's request for punitive damages.

## III. CONCLUSION

For the stated reasons, Defendant's summary judgment motion, ECF No. 24, is **GRANTED IN PART** and **DENIED IN PART**. The Clerk is directed to send copies of this memorandum opinion and accompanying order to all counsel of record.

**ENTER**: This 5th day of August, 2013.

James C. Turk
Senior United States District Judge